## MOORE *v.* MEAD'S FINE BREAD CO.

No. 121.   Argued November 17, 1954.—Decided December 6, 1954.

*Lynell G. Skarda* and *Dee C. Blythe* argued the cause and filed a brief for petitioner.

*Edward W. Napier* argued the cause for respondent. With him on the brief was *Howard F. Houk.*

Mr. Justice Douglas delivered the opinion of the Court.

This is a suit for treble damages, 38 Stat. 731, 15 U. S. C. § 15, brought for violations of § 2 (a) of the Clayton Act, as amended by the Robinson-Patman Act, 49 Stat. 1526, 15 U. S. C. § 13 (a), and of § 3 of the Robinson-Patman Act, 15 U. S. C. § 13a.   The jury found for petitioner; the Court of Appeals reversed, 208 F. 2d 777; and we

granted certiorari, 347 U. S. 1012, because of the importance of the question of law presented.[1]

Petitioner was engaged in the bakery business at Santa Rosa, New Mexico, none of his activities being interstate in character. Respondent is a corporation in the baking business at Clovis, New Mexico. It is one of several corporations having interlocking ownership and management, all in the Mead family and associates. These corporations maintain plants at Lubbock and Big Spring, Texas, and at Hobbs, Roswell, and Clovis, New Mexico. They all market their bread under the name "Mead's Fine Bread" and promote the product through a common advertising program. These corporations purchase their flour and bread wrappers as a unit. Respondent sells bread in Farwell, Texas, a town which it serves with a bread truck operating out of Clovis, New Mexico.

For some months, petitioner and respondent were in competition in Santa Rosa. There is evidence that, on the threat of petitioner to move his bakery to another town, the local Santa Rosa merchants agreed to purchase petitioner's products exclusively. Respondent, labeling that action a boycott, cut the wholesale price of bread in Santa Rosa from 14 cents to 7 cents for a pound loaf and from 21 cents to 11 cents for a pound-and-a-half loaf. The Mead companies did not cut the prices of bread in

---

[1] The case first reached the Court of Appeals on appeal from a dismissal of the action at the close of plaintiff's case. The Court of Appeals affirmed, holding that the suit was precluded by petitioner's own illegal acts which initiated the alleged price discrimination. 184 F. 2d 338. We granted a petition for certiorari, vacated that judgment, and remanded the case to the Court of Appeals for further consideration in light of *Kiefer-Stewart Co.* v. *Joseph E. Seagram & Sons,* 340 U. S. 211. See *Moore* v. *Mead Service Co.,* 340 U. S. 944. On reconsideration, the Court of Appeals receded from its former position, reversed the judgment dismissing the complaint, and remanded the case for trial. 190 F. 2d 540.

any other town; and respondent did not cut its prices of bread in Farwell, Texas.

The price war continued from September 1948 to April 1949, and as a result petitioner was forced to close his business.

The Court of Appeals reversed the judgment for petitioner on the ground that the injury resulting from the price cutting was to a purely local competitor whose business was in no way related to interstate commerce. "If competition was lessened or a monopoly created," said the Court of Appeals, "it was purely local in its scope and effect and in no way related to or affected interstate commerce." 208 F. 2d 777, 780.

Section 2 (a) of the Clayton Act, as amended, 15 U. S. C. § 13 (a), provides in part:

> "It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States . . . and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them . . . ."

Section 3 of the Robinson-Patman Act, 15 U. S. C. § 13a, provides in part:

> "It shall be unlawful for any person engaged in commerce, in the course of such commerce, . . . to sell . . . goods in any part of the United States at prices lower than those exacted by said person else-

where in the United States for the purpose of destroying competition, or eliminating a competitor in such part of the United States; or, to sell . . . goods at unreasonably low prices for the purpose of destroying competition or eliminating a competitor."

Those sections on their face seem to cover the instant case. Respondent is engaged in commerce, selling bread both locally and interstate. In the course of such business, it made price discriminations, maintaining the price in the *interstate* transactions and cutting the price in the *intrastate* sales. The destruction of a competitor was plainly established, as required by the amended § 2 (a) of the Clayton Act; and the evidence to support a finding of purpose to eliminate a competitor, as required by § 3 of the Robinson-Patman Act, was ample.[2]

The Court of Appeals read the antitrust laws as reaching local transactions only where: (1) the local restraint has an effect on the free flow of interstate trade or commerce (*e. g., Wickard* v. *Filburn,* 317 U. S. 111); or (2) the restraint on or the monopoly of local trade is effected through the utilization of interstate mechanisms (*e. g., Lorain Journal Co.* v. *United States,* 342 U. S.

---

[2] Respondent contends that the so-called boycott justified its price cutting. In *Kiefer-Stewart Co.* v. *Seagram & Sons,* 340 U. S. 211, 214, we said, "If petitioner and others were guilty of infractions of the antitrust laws, they could be held responsible in appropriate proceedings brought against them by the Government or by injured private persons. The alleged illegal conduct of petitioner, however, could not legalize the unlawful combination by respondents nor immunize them against liability to those they injured." We need not pursue the matter, for respondent obtained a charge on this phase of the case as to which it cannot complain. The District Court charged the jury that respondent would not be liable if the price cutting was "for the purpose of regaining its own market or of reestablishing competition and not to destroy competition or to eliminate a competitor."

143); or (3) local prices are fixed by the use of interstate commercial transactions (*e. g., United States* v. *Frankfort Distilleries,* 324 U. S. 293); or (4) the discriminatory sales are to purchasers who compete in interstate commerce (*e. g., Corn Products Refining Co.* v. *Federal Trade Commission,* 324 U. S. 726); or (5) interstate commerce is in some other way used to destroy competition or is injured or impaired as a result of unlawful acts.

We think that the practices in the present case are also included within the scope of the antitrust laws. We have here an interstate industry increasing its domain through outlawed competitive practices. The victim, to be sure, is only a local merchant; and no interstate transactions are used to destroy him. But the beneficiary is an interstate business; the treasury used to finance the warfare is drawn from interstate, as well as local, sources which include not only respondent but also a group of interlocked companies engaged in the same line of business; and the prices on the interstate sales, both by respondent and by the other Mead companies, are kept high while the local prices are lowered. If this method of competition were approved, the pattern for growth of monopoly would be simple. As long as the price warfare was strictly intrastate, interstate business could grow and expand with impunity at the expense of local merchants. The competitive advantage would then be with the interstate combines, not by reason of their skills or efficiency but because of their strength and ability to wage price wars. The profits made in interstate activities would underwrite the losses of local price-cutting campaigns. No instrumentality of interstate commerce would be used to destroy the local merchant and expand the domain of the combine. But the opportunities afforded by interstate commerce would be employed to injure local trade. Congress, as guardian of the Commerce Clause, certainly

120

has power to say that those advantages shall not attach to the privilege of doing an interstate business.

This type of price cutting was held to be "foreign to any legitimate commercial competition" even prior to the Robinson-Patman Act. See *Porto Rican American Tobacco Co.* v. *American Tobacco Co.*, 30 F. 2d 234, 237. It seems plain to us that Congress went at least that far in the Robinson-Patman Act. As we have shown, the facts charged and found read upon the words of the statute. And the history of the Act shows it was designed to have the reach now claimed for it by petitioner. Congressman Utterback, manager of the bill in the House, included this type of case in the price cutting that he claimed was outlawed:

> "Where, however, a manufacturer sells to customers both within the State and beyond the State, he may not favor either to the disadvantage of the other; he may not use the privilege of interstate commerce to the injury of his local trade, nor may he favor his local trade to the injury of his interstate trade. The Federal power to regulate interstate commerce is the power both to limit its employment to the injury of business within the State, and to protect interstate commerce itself from injury by influences within the State." 80 Cong. Rec. 9417.

It is, we think, clear that Congress by the Clayton Act and Robinson-Patman Act barred the use of interstate business to destroy local business, outlawing the price cutting employed by respondent.

Other points are pressed on us by respondent in support of the judgment of the Court of Appeals. But we have examined them and found them not substantial. We therefore reverse the judgment of the Court of Appeals and affirm the judgment of the District Court.

*So ordered.*